## Case No. 7,491.

JONES et al. v. The RICHMOND.

[28 Hunt, Mer. Mag. (1853) 709.]

District Court, S. D. New York.[1]

[1] [Reversed by circuit court (case unreported). Decree of circuit court reversed in 19 How. (60 U. S.) 150.]

Mr. Moore and D. Lord, for libelants.
Hoxey & O'Connor, for claimants.

BY THE COURT. The preceding statement of this cause, and the singular ability with which it has been conducted by the learned counsel, mark it as one of great importance. The amount in question is of no small consideration. The principle involved, and the facts in evidence, tend to magnify the deep interest of the parties concerned, as well as the bearing it may have on the commerce and navigation of the country. The great question to be decided in this case is the effect of the sale made by Captain Winters on the 8th of August, 1849. If that sale was a valid one then these libelants are not entitled to a decree and as a necessary consequence the libel must be dismissed. But, on the contrary, if the sale was invalid, the libel must be sustained, and in that event other questions will be open for discussion. The learned counsel have given to the subject so thorough an investigation, that the duties of the court, are rendered much less arduous than they otherwise might have been.

Having alluded to the principle involved, I proceed now to state that principle more at large, and apply it to the facts of the case. Does the law afford the master of a vessel power, under any circumstances, to sell the cargo; and if so, under what circumstances may that power be exerted by the master? Recurring to the early cases in admiralty, the English courts may have held the question in doubt, and, perhaps, we are authorized in saying that the power was denied altogether; but in later years it has been decided otherwise, and in disposing of this case, it may not be important to extend our inquiry beyond the period when, in this country, all doubts have been swept away, and the law on this subject has been settled, too well settled to admit of doubt or difficulty. I will state in the most concise manner possible, what may be considered thus settled. The sale must be bona fide, without fraud or collusion, and under circumstances of extreme necessity. Although in some of the leading cases, language less strong and emphatic, sanctioning a sale, has been used, still in disposing of the present case, it may be proper to adopt the characteristic language used in other cases, "extreme necessity," as more appropriate, without saying that evidence less strong may not be used in other cases. In The Sarah Ann [Case No. 12,342], Obadiah Woodbury and others, claimants, this question is considered at large, and Judge Story, in his opinion, says: "I agree at once to the doctrine, that it is not sufficient to show that the master acted with good faith and in the exercise of his best discretion. The claimants (upon whom the onus probandi of the validity of the sale is thrown) must go farther, and prove that there was a moral necessity for the sale, so as to make it an urgent duty upon the masters to sell for the preservation of the interests of all concerned. And I do not know how to put the case more clearly, than by stating, that if the circumstances were such that an owner of reasonable prudence and discretion acting upon the occasion would have directed the sale from a firm opinion that the brig could not be delivered from the peril at all, or not without the hazard of an expense utterly disproportionate to her real value, as she lay on the beach, then the sale by the master was justifiable, and must be deemed to have been made under a moral necessity." The judge adds: "As to the position of the brig, there is abundant evidence that it was truly perilous." This opinion was pronounced at the May term of the First circuit, 1835, and was taken to the supreme court, and finally disposed of there, at the January term, 1839. See [New England Ins. Co. v. The Sarah Ann] 13 Pet. [38 U. S.] 387. After a very able discussion of the case, the unanimous opinion of the court is there pronounced, most fully confirming Judge Story's doctrine as laid down at the circuit, on the original trial of the cause. The marginal note is an epitome of the case, and is conclusive authority, thus briefly stated: "The right of the master to sell a vessel stranded depends on the circumstances under which it is done to justify it. The master must act in good faith, and exercise his best discretion, for the benefit of all concerned; and a sale can only be

made on the compulsion of a necessity, to be determined in each case by the actual peril to which the vessel is exposed, and from which it is probable, in the opinion of persons competent to judge, the vessel cannot be saved. This is an extreme necessity."

On a particular examination of this case, it would seem that whenever there "is a moral necessity, extreme peril or extreme necessity," the master has the power to sell the vessel, and of course he may, under the like necessity, sell the cargo when it belongs to the same owners. This principle must ever be qualified by the fact, that the master has acted bona fide, and for the benefit of all concerned. A reference to this case, of course, embraces the authorities cited in support of the doctrine maintained, rendering it unnecessary to enumerate those cases here. The doctrines of this case are recognized in Ben. Adm. p. 169, § 299, a work of great merit, recently published. The principles of law having been considered as settled, the remaining inquiry is, do the facts proved present a case falling within those principles?

The facts adduced to establish the sale belong to three distinct classes: (1) To show that the sale was bona fide; (2) to show that the sale was for the benefit of all concerned; and (3) to show that a case of extreme necessity existed. To the first, it is objected that the master of the Elizabeth Frith was a brother of Capt. Winters of the Richmond, under whose authority the sale was made. In the entire absence of all proof showing a collusion between the seller and the purchaser, the relationship alone should not impair the sale. The facts on this point very satisfactorily rebut all presumptions of fraud and collusion. As to the second, after a careful examination of the testimony, I have no doubt, but for this sale, the whole cargo must have proved a total loss. Although but little was saved, yet that little was designed by the seller, and was in fact for the benefit of all concerned. There was no alternative between a total loss and this sale. The testimony has established this beyond a reasonable doubt. As to the third and last class of evidence to sustain the sale, that the condition of the ship was that of extreme necessity, the evidence is overwhelming. Indeed, this point has been so thoroughly maintained, that the libelants do not make it a point in their case, but rely very much on other objections to the sale. There is no necessity of recapitulating the testimony as to the extreme peril the ship was in at the time of the sale, because it is all one way, and stands uncontradicted. The master finds his ship and cargo in the condition of extreme peril, and proceeds to sell so much of the oil and bone as could be taken out of his ship to the masters of the Frith and the Panama, and the same was delivered, on an agreement to pay therefor, at the Sandwich Islands, when the ships arrived there; but before their

arrival at the place of payment, the master of the ship Richmond died at sea, and there was no person at the Sandwich Islands qualified to receive the same, and the money remains due to the owners of the Richmond, and the liability is admitted.

Numerous other objections have been suggested against the validity of the sale, most of which have been removed by evidence, and still a few of those objections require some notice.

It has been said that this was no proper place for the sale; there was no market there. But it should be considered that in waiting for a more convenient place, or a better market, the ship would have gone to pieces, and the whole cargo would have been lost.

It is said, likewise, that there was no money required, and no money paid. In reply to this, it will be remembered, that it was agreed that the payment should be made at the Sandwich Islands, but before the ships, whose masters had purchased the oil, arrived at that place, Capt. Winters, of the Richmond, had deceased at sea, and there was no one authorized to receive payment. It is urged, also, that there was no memorandum or bill of sale of the oil, and that it never was delivered. Neither of those can avail—for in point of fact the oil and bone were delivered, and although there was no bill of sale, yet there was a memorandum in writing kept, and produced in court, of all the oil and bone purchased. In a case like the present a formal bill of sale cannot add to the title of the purchasers. An actual sale and delivery of personal goods, orally, will carry the title as well as a bill of sale. The law does not demand any particular form for the sale of personal goods.

It is insisted that the omission to enter the sale on the log-book is a good reason to set aside the sale as invalid, but the impression cannot well be avoided, that the disaster itself was calculated to prevent the entry. Great confusion, anxiety, and terror must have prevailed, and every moment after the ship struck was employed in devising means to secure something to the owners from the wreck. Besides, if the log-book had been here, with all the circumstances written down upon its pages, by the mate, it would only be cumulative evidence of what is amply proved by a mass of uncontradicted testimony.

And last of all, the principal stress of the libelants rests on their legal proposition, that this was salvage service, and not a sale. Salvage is the compensation that is to be made to persons by whose assistance a ship or its lading has been saved from impending peril, or reward after actual loss. By reference to the testimony, it will be seen at a glance, that this was never undertaken as a salvage service. Situated as these two vessels were at the time, on the best whaling ground, where both ships might have been filled in three or four days, it cannot be be-

lieved that their masters would have undertaken the risk of bringing to the home port the property of another, relying, as they must have done, on uncertain litigation for their compensation. But, again, the oil was taken on an express agreement,—a sale for a stipulated price, excluding altogether the idea of salvage. The law did not compel these masters to receive the oil on such terms, and as they virtually declined, their owners cannot now be compelled to accept salvage compensation.

As to the chronometer, the instruments, and their medicine chest, they are not claimed under any sale or for salvage. It was a mere gratuity. And the owners of the Richmond should be satisfied then without suit or decree, especially when they have been safely kept for their use alone, without any pretence to detain them from the rightful owners.

So far, then, as I have been able to weigh the testimony, and bring the case to the test of well-settled principles of law, I am bound to say, that the sale of the cargo of the ship Richmond, on the 8th of August, 1849, was made under circumstances of necessity; that it was bona fide and for the benefit of all concerned. For these reasons, the sale is upheld, and the libel dismissed, without cost to either party.